### EMPIRE GAS & FUEL CO. v. COUCH.
### (No. 2260.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 14, 1920. Rehearing Denied Jan. 13, 1921.)

1. **Mines and minerals** ⊙⟩109 — **Drilling contractor held not entitled to recover expenses outside his contract.**

Contractor who agreed to drill to specified depth unless owner instructed him to discontinue the drilling at a lesser depth, and who temporarily discontinued drilling and undertook to ream the well for casing, could not recover expenses of reclaiming the well after it was wrecked in the process of reaming, though the contract did not call for reaming well.

2. **Mines and minerals** ⊙⟩109—**Contractor has burden of excusing failure to dig well specified number of feet.**

Contractor, having agreed to drill to specified number of feet unless owner instructed him to discontinue at a lesser depth, was required, in order to recover for digging a fewer number of feet, to justify his failure to dig the specified number of feet by establishing facts that the owner instructed him to cease drilling operations and assumed control of the well.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by T. B. Couch against the Empire Gas & Fuel Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Hutcheson, Bryan & Dyess, of Houston, for appellant.

Campbell, Myer, Myer & Freeman and Sewall Myer, all of Houston, for appellee.

LEVY, J. T. B. Couch, a contractor in the business of drilling oil wells, and the Empire Gas & Fuel Company, a corporation engaged in developing the oil fields in Texas, made the following written contract on October 26, 1917:

"The State of Texas, County of Liberty.

"This memorandum of agreement made and entered into this, the 26th day of October, 1917, by and between T. B. Couch, drilling contractor, party of the first part, and J. W. Jolly representing the Empire Gas & Fuel Company of Texas, party of the second part, witnesseth:

"(1) For and in consideration of the amount hereinafter mentioned first party contracts to drill a well known as 'well No. 1' on the Charles Wilson 150-acre tract of land in Liberty county, Tex., to a depth of 3,500 feet, unless second party or his authorized agent instructs first party to discontinue the drilling at a lesser depth.

"(2) First party is to furnish first-class machinery, drilling tools, baling line, and all fuel oil, and is to move and set all fuel oil and water pipe lines required, and to furnish all camp equipments necessary to take care of the drilling crews.

"(3) Second party is to furnish the derrick, casing, and drilling stem that is considered necessary by second party; all drill stems to be accounted for by the first party, ordinary wear and tear excepted.

"(4) The consideration to the first party is three dollars and twenty-five cents ($3.25) for each and every foot of hole drilled to a depth of 3,000 feet, and three dollars and seventy-five cents ($3.75) for each and every foot of hole drilled from 3,000 feet to 3,500 feet; this price to be paid to first party after the drilling is completed and an accurate log is made and attached to the bill together with any other item of expense which should be paid for by second party, all of which will be approved by second party and sent to the Bartlesville office for payment.

"(5) First party is to look after and conduct, under the direction of second party, any tests that may be desired by second party, without expense to second party other than the actual cost of labor during the time such tests are being made. And first party is to give all tests his personal attention, and is to see that all material and tools are furnished in making such attests, so that there will be no unnecessary delay in completing same.

---

⊙⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"(6) First party is to keep samples of all sands or rock encountered in drilling, and make daily reports on the blanks which are furnished, and mail the same daily to the office of the second party in Houston, Tex. If at any time a sand is developed that shows oil, in the absence of a company inspector the driller is to immediately shut down drilling operations and communicate with the Houston office."

The appellee brought the suit against the appellant, alleging in the petition:

"That by and under the terms of said contract the plaintiff began the drilling of the oil well therein referred to and drilled the same in accordance with the terms of said contract and in accordance with the defendant's orders and instructions to a depth of 2,960 feet; that upon reaching said depth said defendant, acting by and through its authorized agents and representatives, directed and instructed the plaintiff to cease drilling operations, and the defendant did thereupon, by and through its agents and representatives, assume complete charge and control of the said hole so drilled for it by the plaintiff, for the purpose, so plaintiff was informed, of doing extra work on said hole before the making of the test for oil; that the plaintiff thereupon surrendered the possession and control of said hole to the defendant, and the defendant then began the doing of certain work on said hole not required of plaintiff under his contract, during which time the defendant had complete charge and control of said hole and of the employees and of the manner and method of conducting said work; that after the defendant assumed charge and control of said hole the same was never turned back to plaintiff in such condition that any further drilling work could be done thereon, for the reason that during the time defendant had charge and control of said hole it was so damaged and injured that it was rendered physically impossible to continue the drilling thereof; that this damage was due to the carelessness and negligence of the defendant in not taking the proper precaution to protect said hole and in not furnishing casing and in using defective materials and in other matters and things; that after the injuries and damages to said equipment, drilling stem, and hole had occurred, about March 23, 1918, the defendant, through its authorized and empowered agent and representative, requested, agreed, and contracted with the plaintiff to attempt to remove from the hole the damaged drill stem and other materials therein and to try to clean out said hole and to remedy the damage and injury which had theretofore been done by the defendant; that the defendant, through its agent and representative, instructed plaintiff to procure such labor, material, equipment, and tools as were necessary to properly perform said work; that the defendant instructed the plaintiff to do whatever was necessary to properly carry on the work of attempting to clean out said hole and remove the drill stem and other obstructions therefrom; that the defendant also instructed the plaintiff to hire such help as plaintiff deemed necessary to properly prosecute the work, and the defendant thereby agreed to pay plaintiff for all expenses incurred in prosecuting said work, including pay for labor, tools, and materials purchased, and a reasonable compensation to plaintiff for his own time and the reasonable rental for the use of his machinery and tools in prosecuting the work."

The petition asked a recovery under the terms of the written contract of $9,620 for drilling the hole 2,960 feet deep at $3.25 per foot, and also to recover on the alleged contract or agreement for extra work, for the reasonable value of labor employed and paid during 137 days, $3,901.39; for rental of rig used, 130 days, $2,601, and 7 days, $140; for casualty insurance premiums paid $190; for personal service of plaintiff in extra work for four months and one week $1,062.50; for material and equipment purchased $1,643.35. A credit was allowed of $1,440 for fuel oil, and cash of $3,000 paid by the defendant.

The defendant filed a demurrer, general denial, and a special denial that it had instructed plaintiff to permanently cease drilling the hole. Further:

"Defendant pleads that, even had the drilling been permanently discontinued at the depth alleged by plaintiff, the hole had not been properly completed to that depth as required under the contract, in that the hole was not drilled in the size to permit the insertion of the six-inch casing considered necessary by the defendant under the terms of the said contract, and that it was therefore necessary for plaintiff, before delivery of said well, to undertake and complete the enlargement of same to accommodate the said casing which the defendant furnished the plaintiff. Defendant alleges that this reaming out was undertaken, but that the plaintiff never properly completed said reaming out and never delivered to this defendant a well completed to the depth alleged by plaintiff. Wherefore defendant prays that plaintiff take nothing by his suit."

The defendant further pleaded in reconvention.

The court submitted the case to the jury on the following special issue:

"Did defendant, acting through its authorized agents, assume charge of said hole and conduct the reaming operations preparatory to the making of a test?"

The jury answered "Yes." The court entered judgment in favor of the plaintiff on the verdict and from the evidence in the case for $16,000 and interest from date, and against the plea in reconvention.

[1] At the conclusion of the evidence the appellant requested a peremptory instruction in its favor, and predicates error in the refusal of the court to give it. And considering all the evidence and fairly construing it in the light of the written contract, it is concluded that the court should have directed a verdict in favor of the appellant. The written contract in the case stipulates that the appellee should dig the well "to a depth of 3,500 feet unless the second party or

his authorized agent instructs the first party to discontinue drilling at a lesser depth."

[2] Suing as the appellee has upon the contract, for the contract price for 2,960 feet dug thereunder it devolved upon him, in order to recover therefor, to justify the failure to complete the digging of the well to the specified depth by establishing the facts alleged by him that the appellant by its authorized agent instructed the appellee to cease drilling operations, and did by its authorized representative assume complete charge and control of the well so dug by the appellee. Fessman v. Barnes, 108 S. W. 171; Childress v. Smith, 90 Tex. 610, 38 S. W. 518, 40 S. W. 389; 4 Elliott on Contracts, § 3692. According to the evidence, the appellee drilled the well 373 feet at 14 inches diameter, then to 2,-132 feet at 9⅞ inches diameter. At 2,132 feet to 2,700 feet deep the diameter of the well was 7⅞ inches, and from 2,700 to 2,860 feet the diameter was 5⅞ inches. Mr. Davis was appellee's day driller and had entire charge of the well drilling during that time. Mr. Davis had a crew of three men working with him. Mr. Whitley was the appellant's field foreman, and was at the well from the beginning for the purpose of overlooking the work being done as to appellant's interests. Mr. Jolly was the appellant's local manager and authorized representative. When the drilling of the well reached the depth of 2,960 feet, which was in the forenoon of March 14th, Jolly, Whitley, and Davis consulted together and agreed that there was a strong and paying showing of oil in the sand then penetrated. Thereupon Mr. Jolly told Mr. Davis, the driller, "The next thing is to get the casing set as soon as possible, and we will test this sand." And the evidence conclusively shows, we think, that the appellee, Couch, and his authorized driller, Davis, began and undertook "to get the casing set as soon as possible" as a preliminary matter to the testing for oil, as provided under the terms of the contract. The casing to be set was 6 inches in diameter and was to be provided by the appellant, as required by the written contract expressly providing that the appellant was to furnish "the casing considered necessary by the second party (the appellant)." The well at that time in part was 5⅞ inches in diameter, and reaming was necessary, as the parties fully understood, in order to put in the 6-inch casing. The conversations and acts of the parties at the time so show. Mr. Jolly, as he testified, said to Mr. Davis, the driller, "The next thing is to get the casing set as soon as possible, and we will test this sand." He further testified:

"I then stayed for a limited time. I said to Mr. Davis, the driller, at that time, and to Mr. Whitley, both of them, 'It is my understanding you don't have but a little reaming to do, and we can get the casing set without much delay.' I had in my mind that they would have

226 S.W.—70

to ream from between 2,600 and 2,700 feet to a little over 2,800 feet. I do not mean from the point where they reduced the pipe from 9⅞ to 7⅞, but where they reduced the hole from 7⅞ to 5⅞. There was nothing said further than this; they began to make arrangements to go ahead to ream the hole. * * * I did order the reaming done on the well the day I was out there and found the oil sand."

Mr. Whitley testified:

"It was one morning that they drilled into what I thought was pay sand, or what they thought was pay oil sand. I had given instructions as to what they should do in the event they hit oil sand. They were drilling in gumbo at the time I gave these instructions. We nearly always found oil sand right under a heavy strata of gumbo. I told Mr. Davis when we went through this gumbo I would rather he would not go over three or four feet into whatever soft digging he found under it until he pulled out, whether it showed or did not show, because sometimes at a great depth that way a column pressure is such pressure that it keeps the oil so it does not show up on the return of the water. * * * So then Mr. Jolly and myself, after we had looked this over and told Mr. Davis to make ready for setting his casing, we got into the car and went back to Mr. Grant's rig, where my horse was tied. I heard Mr. Jolly make this statement: 'That you only have a short ways to ream; that you already have a good hole down to about 2,700 feet.'"

Appellee, Couch, testified:

"At 2,960 feet I had a conversation with Mr. Jolly in his office in Houston, Tex. Prior to going to Mr. Jolly's office I had a telephone conversation from the well; I talked to Davis, the driller. After my conversation with Mr. Davis I went to Mr. Jolly's office. * * * When I went to Mr. Jolly's office on this occasion, he told me about finding the sand out there and that he had instructed them to stop drilling and do some extra work, ream the hole, or something to that effect. He said he was doing some extra work, going to ream the hole out, and when he got ready to make the test he would let me know at home."

Davis, the driller, testified:

"Mr. Jolly said, 'Well, I think you had better ream the hole out from 2,132 to 2,850 feet and set it (the casing) there.' I told him, 'All right.' He says, 'Don't go no deeper, but reduce and go to reaming now.' I ran a 9⅞ hole in the hole that evening. Those orders were given by Mr. Jolly. He is the man that directed me to begin at 2,132 feet and ream down to 2,850 feet with a 9⅞ bit."

Davis further said:

"That night I called Mr. Couch up over the phone and was talking to him. My 9⅞ bit was in the hole then. We wasn't reaming, but was ready to ream. I told Mr. Couch I had struck the pay sand, and he says: 'Good for you, Frank. How much are you in it?' I says: 'About 16 feet in pay.' He says: 'Well, is there anybody there?' I says: 'Mr. Jolly was here and Mr. Whitley was here. Mr. Jolly

wanted to leave, but I insisted on him staying until I pulled this pipe so that he could see the cuttings. Mr. Jolly and Mr. Whitley washed them out, and Mr. Whitley and Mr. Jolly decided to ream down and set the casing.' He says: 'Where are they going to ream from?' I says: 'One wants to ream from 2,700 down, and the other wants to ream from 2,132 down.' He says: 'What are you going to do about it.' I says: 'I am going to do what Mr. Jolly says; ream it from 2,132 feet.' He says: 'All right. Take all orders from them, the Empire.' I says: 'All right, sir.' "

It is apparent that the entire subject-matter discussed was that of reaming the well for casing, and not a discontinuance, as pleaded, of drilling operations at that depth. And it is apparent from the evidence that Mr. Davis, the authorized agent of the appellee, actually undertook and began to ream the well; for he testified, "I ran a 9⅞ hole in the hole that evening." Appellee knew, according to Mr. Davis' evidence, that Davis, his agent, was intending and preparing to ream the well as a means of casing it preliminary to a test for oil under the terms of the contract; and, so knowing, he expressly instructed his agent, Davis, "to do what Mr. Jolly says and to take all orders from them, the Empire." If the reaming was undertaken, as it conclusively appears was done, by the appellee in order to permit the insertion of the 6-inch casing considered necessary by the appellant under the terms of the contract, then it could not legally be said that the appellant had ousted the appellee from performance of the contract and had itself thereafter taken over and assumed exclusive charge and control of the well. And if, as was done, the appellee, through his agent, Davis, undertook to enlarge the well to accommodate the casing deemed necessary by the appellant, which was a term of the written contract, then it becomes immaterial whether "reaming" was or was not a part of the methods of testing for oil. The appellee would still be furthering the terms of the written contract and in actual charge in completing the enlargement of the well to accommodate the casing. And, even though the diameter of the well in part may have been reduced to 5⅞ inches diameter in the original drilling by the instructions of the appellant, and that reaming the well became and was extra work outside of the terms of the written contract, as claimed by appellee, nevertheless the evidence conclusively shows that the appellee continued in possession of the well and undertook to do such reaming, and, having undertaken to do it, he would be bound by his undertaking to finish the reaming and would be responsible for its accomplishment. It is not denied in the record that the well was wrecked in the course of the reaming, through negligent operation of the drill. As the reaming was undertaken by appellee in furthering the contract, or even as extra work, the appellee would be, as a matter of law, legally in charge of the drilling operations and as well in exclusive charge and in authority over the employees working for him. Mr. Whitley, appellant's representative, would have no legal authority to discharge the employees of the appellee, and the discharge of an employee working under Mr. Davis, the appellee's driller, by Mr. Whitley would only be attributed to the acquiescence or consent of the appellee or his agent, Davis, in the discharge. The appellee could recover the expense alleged of reclaiming the well after the wrecking of it in the process of reaming only upon the fact that the appellant had taken exclusive charge and control of the well independent of the contract, and was therefore responsible for the loss of the well.

As the court should have given the requested peremptory instruction, the judgment is reversed, and judgment is here rendered in favor of the appellant with costs of this court and of the trial court.

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes